IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM A. DAVIS,                          :

    Plaintiff,                              :

v.                                         :        CA 15-00131-CG-C

CENTRAL ALABAMA ELECTRIC                   :
COOPERATIVE,
                             :

    Defendant.

## REPORT AND RECOMMENDATION

This matter is before the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), on the Plaintiff's Motion to Remand this matter to the Circuit Court of Dallas County, Alabama, (doc. 8); the Defendant's response (doc. 11); the Plaintiff's reply (doc. 12); the supplemental submission of recent authority filed by the Defendant (doc. 14); and the supplemental submission filed by the Plaintiff (doc. 15).  After careful consideration of the pleadings and the briefs of the parties, it is **RECOMMENDED** that the Plaintiff's motion be **DENIED**.

## Background

The Plaintiff filed his Complaint (doc. 1-1) in the Circuit Court of Dallas County, Alabama, on January 26, 2015, asserting a putative class action against the Defendant, Central Alabama Electric Cooperative ("CAEC"), an electric cooperative that provides electricity to residents in several counties in central Alabama, including Dallas County. (Doc. 11 at 6.)  The Plaintiff alleges that CAEC has violated section 37-6-20 of the Alabama Code[1] by failing to distribute excess revenues to its members.  (Doc. 1-1, ¶¶ 12,

---

[1]      Section 37-6-20 provides as follows:

14.)     In Count I of the Complaint, the Plaintiff seeks declaratory, injunctive and equitable relief.  (*Id.* at 7.)  Specifically, he seeks

    a.       A permanent injunction requiring the Defendant to distribute excess revenue each year in the form of either refunds and/or rate reductions in accordance with Ala. Code § 37-6-20; and find that Defendant has failed to distribute excess revenue each year in violation of Ala. Code § 37-6-20.

    b.       An order awarding full restitution to Plaintiff and the putative Class members, together with costs, expenses, interest, and reasonable attorneys' fees; and

    c.       An order awarding Plaintiff and the putative Class members such other relief that the Court deems equitable under the circumstances.

(Doc. 1-1 at 7.)  In Count II, the Plaintiff asserts a claim for breach of contract.  (*Id.* at 7-8.)  The Plaintiff alleges that CAEC's bylaws constitute a contract between CAEC and the Plaintiff, that those bylaws incorporate the statutory obligations of section 37-6-20,

---

Revenues of a cooperative for any fiscal year in excess of the amount thereof necessary to defray expenses of the cooperative and of the operation and maintenance of its facilities during such fiscal year; to pay interest and principal obligations of the cooperative coming due in such fiscal year; to finance or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the board of trustees; to provide a reasonable reserve for working capital; to provide a reserve for the payment of indebtedness of the cooperative maturing more than one year after the date of the incurrence of such indebtedness in an amount not less than the total of the interest and principal payments in respect thereof required to be made during the next following fiscal year; and to provide a fund for education in cooperation and for the dissemination of information concerning the effective use of electric energy and other services made available by the cooperative shall be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year or by way of general rate reductions, or by combination of such methods. Nothing contained in this article shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due.

Ala. Code § 37-6-20 (1975).

and that CAEC breached its contract with the Plaintiff when it failed to distribute its excess revenue.  (*Id.*)  In Count III (mislabeled as Count II), the Plaintiff asserts an unjust enrichment claim against CAEC; and in Count IV the Plaintiff requests an accounting to determine the amount CAEC owes to the Plaintiff and each member of the putative class.  (*Id.* at 8-9.)

CAEC filed its Notice of Removal (doc. 1) in this Court on March 10, 2015,[2] asserting that removal is proper pursuant to 28 U.S.C. § 1442(a)(1), which allows for the removal of actions against "any person acting under [an] officer[] of the United States or of any agency thereof[.]"  *Id.*  CAEC argues that, when determining whether to issue distributions to its members, it acted under the direction of the Rural Utilities Service (RUS),[3] which prohibited CAEC "from making distributions of patronage capital to members if, after giving effect to the distribution, CAEC's equity will fall below 30 percent (30%) of its total assets."  (Doc. 1, ¶¶ 6-8.)  The Plaintiff argues that section

---

[2]    The Notice of Removal was timely filed because CAEC was served with the Summons and Complaint on February 13, 2015, (*see* doc. 1 at 1; doc. 1-1 at 11).  28 U.S.C. § 1446(b) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based[.]").

[3]    The RUS is a federal agency.  *See* 7 U.S.C. § 6942.

The Secretary of Agriculture (Secretary) established the Rural Utilities Service (RUS) on October 20, 1994, pursuant to the Department of Agriculture Reorganization Act of 1994, (7 U.S.C. 6941 et seq.). RUS was assigned responsibility for administering electric and telecommunications loan and loan guarantee programs previously administered by [the Rural Electrification Administration (REA)], including programs of the Rural Telephone Bank (RTB), and water and waste loans and grants previously administered by the Rural Development Administration, along with other functions as the Secretary determined appropriate. The rights, interests, obligations, duties, and contracts previously vested in REA were transferred to, and vested in RUS.

7 C.F.R. § 1700.1(c).

1442(a)(1) is not implicated in this case and, therefore, this matter should be remanded

to the Circuit Court of Dallas County, Alabama.  (Doc. 8.)[4]

## Discussion

28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute, allows removal of any civil or criminal action against "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office."[5] The right of removal "is made absolute whenever a suit in a state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court." *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969). If the statutory prerequisites are satisfied, section 1442(a)(1) provides an independent federal jurisdictional basis.

*Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996).   Although a

"federal defense generally does not qualify a case for removal[,]" actions falling under

the federal officer removal statute "may be removed despite the nonfederal cast of the

complaint[.]"  *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed.

---

[4]     The Plaintiff also argues in his Motion to Remand that this Court does not have federal question jurisdiction over this case.  (Doc. 8 at 18-22.)  Because CAEC made no assertion of federal question jurisdiction in its Notice of Removal, (*see* doc. 1), and acknowledged that fact in its response brief, (doc. 11 at 3 n.1 ("CAEC did not raise a federal question in its notice of removal, it raised only federal officer removal[.]"), the undersigned does not address the Plaintiff's arguments regarding federal question jurisdiction herein.

[5]     Section 1442(a) provides in pertinent part as follows:

**(a)** A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

   **(1)** The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

§ 1442(a).

2d 408 (1999) (citation omitted).   Furthermore, "[u]nlike certain other removal provisions, § 1442(a) must be liberally construed in favor of removal."  *Morgan v. Bill Vann Co., Inc.*, Civil Action 11-0535-WS-B, 2011 WL 6056083, at *3 (S.D. Ala. Dec. 6, 2011) (citations omitted).

To establish jurisdiction pursuant to section 1442(a)(1), CAEC "must show that (1) it is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office."  *Morgan*, 2011 WL 6056083, at *3 (citing *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3rd Cir. 1998); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 135 (2nd Cir. 2008); *In re Asbestos Litigation*, 661 F. Supp. 2d 451, 453 (D. Del. 2009)) (internal quotation marks omitted); *accord Swanstrom v. Teledyne Cont'l Motors, Inc.*, 531 F. Supp. 2d 1325, 1331 (S.D. Ala. 2008) (citing *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 967 n.2 (8th Cir. 2007)).

The first requirement is not in dispute as it is clear that CAEC is a person within the meaning of section 1442(a)(1).  (Doc. 8 at 7 n.3 ("Plaintiff concedes that CAEC meets the requirement of being a 'person' within the meaning of the statute.").)  This Court and most other courts have found that corporations are persons for purposes of that section.  *See Morgan*, 2011 WL 6056083, at *3 n.3 (citing *Bennett*, 607 F.3d at 1085; *Isaacson*, 517 F.3d at 136; *In re Asbestos*, 661 F. Supp. 2d at 454); *Swanstrom*, 531 F. Supp. 2d at 1331 (citing *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1196 (M.D. Fla. 2006); *Alsup v. 3-Day Blinds, Inc.*, 435 F. Supp. 2d 838, 845 n.3 (S.D. Ill. 2006); *Jones v. Three Rivers Elec. Coop.*, 166 F.R.D. 413, 414 (E.D. Mo. 1996)).  CAEC is a cooperative non-profit membership corporation organized pursuant to Ala. Code § 37-6-1, *et seq.*  (Doc.

5

1-1, ¶ 1; doc. 1-2 at 2; doc. 11 at 6.)  Thus, CAEC, as a corporation, is a person within the meaning of the statute.  However, the Plaintiff contends CAEC has failed to show that the other three requirements are satisfied.  Those requirements are discussed below.

*Acting under a federal office*

"[T]he 'acting under' element  is satisfied if a defendant's 'actions that led to the lawsuit were based on a federal officer's direct orders or comprehensive and detailed regulations.'"  *Morgan*, 2011 WL 6056083, at *3 n.3 (quoting *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 777 (E.D. Pa. 2010)).  Although "[a] defendant's actions taken pursuant to a comprehensive and detailed federal regulatory scheme may qualify the defendant as 'acting under' the direction of a federal officer[,] . . . [m]ere participation in a regulated industry is insufficient to support removal unless the challenged conduct is closely linked to detailed and specific regulations."  *Swanstrom*, 531 F. Supp. 2d at 1331-32 (citing *King v. Provident Bank*, 428 F. Supp. 2d 1226, 1231 (M.D. Ala. 2006)) (internal quotation marks omitted).

CAEC argues that the "acting under" element is satisfied because it acted pursuant to the detailed regulatory framework imposed by the RUS, as well as the specific directives in CAEC's contract with the RUS.  Regarding the level of control imposed by the RUS, CAEC asserts that

> [b]y virtue of its loan agreement with RUS, CAEC must comply with a series of regulations that touch on nearly every facet of CAEC's operations.  *See* 7 C.F.R. § 1700 to § 1730.  This includes electrical engineering and architectural controls, construction contract requirements (7 C.F.R. §§ 1724 & 1726), and being subject to regular RUS auditing of the use of loan funds (7 C.F.R. § 1737).  RUS must approve many of [CAEC]'s contracts, and, under some circumstances, its selection of a general manager, board compensation, expenditures, and even the bank CAEC uses.  17 C.F.R. §§ 1717.600 *et seq.*

(Doc. 11 at 6-7.)  Indeed, the RUS maintains significant control over CAEC.  *See, e.g.*, 7 C.F.R. § 1717.605 ("All borrowers, regardless of the source of funding, are required to

comply with applicable RUS requirements with respect to system design, construction standards, and the use of RUS accepted materials."); § 1717.608 ("Power supply contracts . . . are deemed approved if they have a term of 2 years or less."); § 1717.609 ("If a borrower is in default with respect to any provision of its loan documents or any other agreement with RUS: (1) Such borrower, if directed in writing by RUS, shall replace its general manager within 30 days after the date of such written notice; and (2) Such borrower shall not hire a general manager without prior written approval by RUS.").

Additional restrictions and controls are set forth in the "RUS LOAN CONTRACT" ("the Contract") executed by CAEC and the United States on February 2, 2009.  (Doc. 1-2 at 3.)  Most significantly, the Contract provides as follows regarding distributions to CAEC's members:

**Section 6.8    Limitation on Distributions.**

Without the prior written approval of RUS, [CAEC] shall not in any calendar year make any Distributions (exclusive of any Distributions to the estates of deceased natural patrons) to its members, stockholders or consumers except as follows:

(a)     Equity above 30%.  If, after giving effect to any such Distribution, the Equity of [CAEC] shall be greater than or equal to 30% of its Total Assets; or

(b)     Equity above 20%.  If, after giving effect to any such Distribution, the Equity of [CAEC] shall be greater than or equal to 20% of its Total Assets and the aggregate of all Distributions made during the calendar year when added to such Distribution shall be less than or equal to 25% of the prior year's margins.

Provided however, that in no event shall [CAEC] make any Distributions if there is unpaid when due any installment of principal of (premium, if any) or interest on any of its payment obligations secured by the Mortgage, if the Borrower is otherwise in default hereunder or if, after giving effect to any such Distribution, the Borrower's current and accrued assets would be less than its current and accrued liabilities.

(*Id.*, § 6.8.)   Furthermore, 7 C.F.R. § 1717.617 provides the following limitation on distributions:

> If a distribution or power supply borrower is required by its loan documents to obtain prior approval from RUS before declaring or paying any dividends, paying or determining to pay any patronage refunds, or retiring any patronage capital, or making any other cash distributions, such approval is hereby given if the following conditions are met:
>
> (a)   After giving effect to the distribution, the borrower's equity will be greater than or equal to 30 percent of its total assets;
>
> (b)   The borrower is current on all payments due on all notes secured under the mortgage;
>
> (c)   The borrower is not otherwise in default under its loan documents; and
>
> (d)   After giving effect to the distribution, the borrower's current and accrued assets will be not less than its current and accrued liabilities.

7 C.F.R. § 1717.617.

CAEC contends that the excess revenue or patronage capital that the Plaintiff claims should have been distributed to its members, (doc. 1-1, ¶ 2), was retained by CAEC to comply with the RUS's requirement that CAEC maintain equity above 30%. (Doc. 1, ¶ 7; doc. 11 at 11-12.)  Thus, CAEC argues that it acted under the RUS when it retained those funds.   (Doc. 11 at 11-12.)   The undersigned agrees.   CAEC has adequately shown for purposes of removal that it acted pursuant to the RUS's detailed regulatory framework and the specific requirements in the Contract.   CAEC is not merely conducting business within a regulated industry.   The RUS exercises considerable control over CAEC through the regulations and contractual provisions governing CAEC's operations.  *See supra*; *see also Kritner v. Arab Elec. Coop.*, No. 4:15-CV-341-VEH, 2015 WL 2354414, at *4 (N.D. Ala. May 14, 2015) (concluding that an electric cooperative acted under a federal officer when it acted pursuant to its contract with the

Tennessee Valley Authority); *Lake v. Marshall-DeKalb Elec. Coop.*, No. 4:15-CV-339-VEH, 2015 WL 2354384, at *4 (N.D. Ala. May 14, 2015) (same).[6]  More importantly, the RUS directly controls CAEC's distributions to its members by placing specific and detailed limitations on said distributions.  (Doc. 1-2, § 6.8.)[7]

In *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 154, 127 S. Ct. 2301, 2308, 168 L. Ed. 2d 42 (2007), the Supreme Court provided guidance to courts applying the federal officer removal statute to situations where corporations maintain a contractual relationship with the United States.  In *Watson*, the Supreme Court held that a cigarette manufacturer, which was not acting pursuant to a contract with the United States, did not act under a federal officer merely by complying with federal regulations.  *Id.* at 153 ("The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'").  The Court stated that, for a private

---

[6]      In *Kritner* and *Lake*, the Northern District of Alabama treated the acting under and causal nexus prongs as a single requirement.  *See Kritner*, 2015 WL 2354414, at *2 n.2; *Lake*, 2015 WL 2354384, at *2 n.3.

[7]      At the time of the hearing on Plaintiff's motion to remand, Plaintiff's counsel argued that CAEC's showing was insufficient because CAEC had not produced an affidavit from a representative of the RUS confirming that the RUS prohibited CAEC from distributing the excess revenues at issue.  However, CAEC's burden is not so heavy as to require the evidentiary showing demanded by the Plaintiff.  *See Magnin*, 91 F.3d at 1428-29 (concluding that the defendant established the "acting under" requirement where the defendant did not produce any affidavits or other evidentiary submissions); *Morgan*, 2011 WL 6056083, at *4 ("[F]ederal courts have routinely allowed defendants removing on the basis of federal officer jurisdiction . . . to rely on factual allegations in the notice of removal untethered to specific evidentiary proof."); *Holton v. Blue Cross & Blue Shield of S.C.*, 56 F. Supp. 2d 1347, 1351-52 (M.D. Ala. 1999) (finding that Blue Cross and Blue Shield established that it was acting under a federal office without making an evidentiary showing).  Here, CAEC's showing is sufficient based on the Contract (doc. 1-2), the regulatory framework discussed above, and CAEC's representations in its notice of removal (doc. 1) and its response brief (doc. 11).

person, "'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152 (emphasis and citation omitted).[8]  The Court distinguished the cigarette manufacturer's actions from those of private firms acting under a contract with the United States.  *Id.* at 153-54.  Specifically, the Court stated as follows:

> [The defendant] asks why, if close supervision is sufficient to turn a private contractor into a private firm "acting under" a Government "agency" or "officer," does it not do the same when a company is subjected to intense regulation.
>
> The answer to this question lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of *Winters* [*v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (1998)], for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.
>
> These circumstances distinguish *Winters* from this case. For present purposes that distinction is sufficient. And we need not further examine here (a case where private contracting is not at issue) whether and when

---

[8]       As the Supreme Court explained,

the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law. We recognize that sometimes an English speaker might say that one who complies with the law "helps" or "assists" governmental law enforcement. Taxpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, for that matter well-behaved federal prisoners, all "help" or "assist" federal law enforcement authorities in some sense of those words. But that is not the sense of "help" or "assist" that can bring a private action within the scope of this statute. That is in part a matter of language. One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as *compliance* with the law (or *acquiescence* to an order), not as "acting under" a federal official who is giving an order or enforcing the law.

*Watson*, 551 U.S. at 152 (citation omitted).

particular circumstances may enable private contractors to invoke the statute.

*Id.* Thus, "[w]hile the [Supreme] Court has not precisely determined 'whether and when particular circumstances may enable private contractors to invoke the statute,' . . . it has noted with approval that 'lower courts have held that Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision.'" *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, --- F.3d ----, 2015 WL 3634888, at *7-8 (3d Cir. 2015) (quoting *Watson*, 551 U.S. at 153-54).

Subsequently, several courts considering whether the federal officer removal statute applies to private contractors have applied the principles discussed in *Watson*. The Second and Seventh Circuits have applied the Supreme Court's reasoning in *Watson* to determine that military contractors fall within the scope of the statute. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (concluding that a corporation that supplied the Navy with turbines satisfied the acting under requirement); *Isaacson*, 517 F.3d at 136-37 (concluding that a chemical company providing the United States military with Agent Orange satisfied the acting under requirement). Likewise, the Third Circuit applied the principles in *Watson* when determining that the Federal Community Defender, a private entity "that represents indigent defendants charged with federal crimes,"[9] acted under a federal officer. *In re Commonwealth's Motion*, 2015 WL 3634888, at *2, 7-9. The Fifth Circuit concluded that a standing bankruptcy trustee

---

[9]     "The Federal Community Defender is a non-profit entity created through the Criminal Justice Act that is delegated the authority to provide representation under the CJA and [18 U.S.C.] § 3599." *In re Commonwealth's Motion*, 2015 WL 3634888, at *8.

acted under a federal officer. *Bell v. Thornburg*, 743 F.3d 84, 88-89 (5th Cir. 2014) ("[Standing trustees] 'assist' and 'carry out' the duties and tasks of their federal superiors. Thus, we conclude that [the defendant] 'act[s] under' officers of the United States and fall[s] within § 1442(a)(1)'s purview."). The Sixth Circuit held that a private mold remediation firm removing mold from an airport acted under a federal officer. *Bennett*, 607 F.3d at 1086-88 ("[W]e conclude that the contractual 'relationship between [MIS] and [the FAA] [was] an unusually close one[,] involving detailed regulation, monitoring, [and] supervision.' For these reasons, we conclude that MIS has satisfied § 1442(a)(1)'s 'acting under' requirement." (quoting *Watson*, 551 U.S. at 148, 153)). The Eighth Circuit held that health insurance companies administering health care plans covered by the Federal Employees Health Benefits Act (FEHBA) acted under a federal officer. *Jacks v. Meridian Res. Co, LLC*, 701 F.3d 1224, 1230-32 (8th Cir. 2012) ("We thus conclude that FEHBA program carriers contracting with the federal government to provide health care insurance for federal employees are not unrelated and wholly separate business entities merely doing business in a highly regulated arena, but rather conduct business under the delegation of the federal government.").

The Eleventh Circuit has not yet discussed the Supreme Court's analysis in *Watson*. However, prior to *Watson*—and seven years before the Eighth Circuit's decision in *Jacks*—, the Eleventh Circuit concluded in an unpublished opinion that "[a] health plan insurer contracting with a government agency under a federal benefits program is considered a 'person acting under' a federal officer." *Anesthesiology Associates of Tallahassee, Fla., P.A. v. Blue Cross Blue Shield of Fla., Inc.*, No. 03-15664, 2005 WL 6717869, at *2 (Mar. 18, 2005) (per curiam) (unpublished) (citing *Peterson v. Blue Cross/Blue Shield of Tex.*, 508 F.2d 55, 56–58 (5th Cir. 1975)). In that case, the plaintiff brought a claim against Blue Cross Blue Shield seeking reimbursement for services

under health benefit plans that were administered by Blue Cross Blue Shield and covered by the FEHBA. *Id.* at *1. In determining that Blue Cross Blue Shield had properly removed the matter under the federal officer removal statute, the Eleventh Circuit noted that "FEHBA gives OPM [the U.S. Office of Personnel Management] the authority to administer the program by contracting with qualified private carriers . . . , by distributing information on the available plans to eligible employees, by promulgating necessary regulations, and by interpreting the plans to determine the carrier's liability in an individual case." *Id.* (citations and internal quotation marks omitted).[10] The Eleventh Circuit's decision in *Anesthesiology Associates* is consistent with the principles discussed in *Watson*. *See Jacks*, 701 F.3d at 1233-35 (concluding that Blue Cross Blue Shield, "and other similar entities, help the government fulfill the basic task of establishing a health benefits program for federal employees"); *see id.* (discussing *Watson* and citing *Anesthesiology Associates*). Thus, in determining whether CAEC acted under the RUS, the undersigned considers *Anesthesiology Associates* in conjunction with *Watson* and the cases from our sister circuits cited above.

---

[10]     In *Peterson*, the case relied upon by the Eleventh Circuit in *Anesthesiology Associates*, the former Fifth Circuit held that Blue Cross Blue Shield "act[ed] within the purview of 1442(a)(1)" and properly removed the matter where Blue Cross Blue Shield was operating under Medicare pursuant to a contract with the United States. *Peterson*, 508 F.2d at 57-58. In *Holton v. Blue Cross & Blue Shield of S.C.*, the Middle District of Alabama reached a similar conclusion finding that Blue Cross and Blue Shield acted under a federal officer for purposes of the federal officer removal statute when it acted pursuant to a contract with the federal government to administer a health care program through which medical care was provided to "dependents of members of the uniformed services." *Holton*, 56 F. Supp. 2d at 1351-52. Subsequently, in *Ala. Dental Ass'n v. Blue Cross & Blue Shield of Ala., Inc.*, the Middle District followed its decision in *Holton*, as well as the Eleventh Circuit's decision in *Anesthesiology Associates*, in finding that Blue Cross Blue Shield had acted under a federal officer when it acted in compliance with the directives of the OPM pursuant to the FEHBA. *Alabama Dental*, No. 205-CV-1230-MEF, 2007 WL 25488, at *7-8 (M.D. Ala. Jan. 3, 2007).

Here, CAEC is achieving an important service—rural electrification—intended by the United States and facilitated through the RUS. The REA, the precursor to the RUS, was established

> to 'initiate, formulate, administer, and supervise a program of approved projects with respect to the generation, transmission, and distribution of electric energy in rural areas.' The objective was to provide electricity to those sparsely settled areas which the investor-owned utilities had not found it profitable to service. To this end [the] REA makes long-term low-interest loans to approved non-profit cooperatives organized and owned by their consumer members, usually farmers, who have been unable to obtain electricity from any other source.

*Salt River Project Agric. Improvement and Power Dist. v. Fed. Power Comm'n*, 391 F.2d 470, 473 (D.C. Cir. 1968) (citing Executive Order No. 7037, issued May 11, 1935, and noting that "[t]he Rural Electrification Act, [which] provid[ed] a statutory basis for the Administration[,] was enacted the following year. 7 U.S.C. §§ 901 et seq. (1964 ed.)"); *id.* at 475 ("For, in contrast to the Federal Power Act, the Rural Electrification Act which was conceived contemporaneously was not the response to a need for reform in an immense and corrupted industry, but rather constituted simply an attempt, through rural electrification cooperatives, to bring economical electric power to the nine out of ten farms that were then without it." (footnote omitted)).[11]  Significantly, the former

---

[11]     Additionally, in *Salt River Project*, the D.C. Circuit discussed the level of control employed by the REA to facilitate rural electrification.  The D.C. Circuit explained that

> [the] REA exercises extensive supervision over the planning, construction and operation of the facilities it finances. The REA borrower as a condition of securing its loan must secure REA approval of its manager, engineer and counsel; of its construction contracts and contracts for purchase of materials, equipment and supplies; of its contracts for purchase and sale of power; of its insurance coverage, its purchase of land, and so on. Moreover, [the] REA's concern is not only with providing high standards of electric service and guaranteeing its loan, but also with reducing the cost of service to the cooperative's consumers. It furnishes retail rate schedules designed for rural use and assists distribution cooperatives in obtaining electric energy at reasonable costs.

Fifth Circuit has stated that "rural electric cooperatives are something more than public utilities; they are instrumentalities of the United States. They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America." *Ala. Power Co. v. Ala. Elec. Coop., Inc.*, 394 F.2d 672, 677 (5th Cir. 1968) (citations and internal quotation marks omitted);[12] *see Greensboro Lumber Co. v. Ga. Power Co.*, 643 F. Supp. 1345, 1358-59 (N.D. Ga. 1986) ("[The defendant] owes its existence to the Rural Electrification Administration ("REA") in that it is principally financed by loans and loan guarantees of the United States, acting through the REA. . . . The objectives of the REA Act were to extend the benefits of economical central station service to the numerous farms in sparsely-settled areas in which investor-owned utilities had not found it profitable to provide service." (citations omitted)), *aff'd*, 844 F.2d 1538 (11th Cir. 1988).[13]

---

*Salt River Project*, 391 F.2d at 473.

[12]     The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.  *Id.* at 1209.

[13]     In *Alabama Power*, the former Fifth Circuit held that Alabama Electric Cooperative, Inc., a rural electric cooperative, was immune from anti-trust claims arising from its contract with distribution cooperatives where the contract was required by the REA and where the Administrator of the REA was immune from such claims.  *Alabama Power*, 394 F.2d at 676-77 ("The making of loans by the Administrator necessarily includes the existence and ability of borrowers to whom such loans can be made. If the security which the Administrator requires can be undercut and the borrower mulcted in treble damages for complying with the condition imposed by the Administrator for making the loan, then the functioning of the Act will be crippled, if not defeated. To avoid frustrating the intent of Congress, it must follow that in cases where the Administrator is immune from suit under the antitrust laws, the borrower is likewise immune."). In *Greensboro Lumber*, the Eleventh Circuit followed *Alabama Power* and concluded that electric cooperatives in Georgia were immune from antitrust claims arising from the same types of contracts at issue in *Alabama Power*.  *See Greensboro Lumber*, 844 F.2d at 1540-42; *see also United States v. Coosa Valley Elec. Coop., Inc.*, Civ. A. No. 85-C-0515-S, 1986 WL 11270, at *5-6 (N.D. Ala. Feb. 5, 1986) ("[T]o deny antitrust immunity [to Alabama Electric Cooperative, a cooperative organized under Ala. Code § 37-6-1, *et seq*,] would undermine the operation of the Rural Electrification Act which specifically authorizes the Administrator to obtain reasonably adequate security for loans made pursuant to the Act. We therefore conclude that implied repeal of the antitrust laws with respect to the REA approved power supply contracts between

CAEC was formed in 1938 and began providing rural communities with electricity in 1939, after receiving a loan from the REA.[14]  CAEC states that "it has borrowed money from the United States . . . since its inception," (doc. 11 at 6), and, as discussed above, it has been subject to extensive supervision and regulation by the federal government.  CAEC is not merely complying with the law like the cigarette manufacturer in *Watson*.  *Watson*, 551 U.S. at 152-53.  Rather, it exists to provide a necessary function for the public as conceived and directed by the United States.[15]  In this respect, CAEC is assisting the federal government with its rural electrification program.  *See, e.g., Alabama Power*, 394 F.2d at 677.  The United States need not perform that service directly because CAEC, and other rural electric cooperatives, fill that void.  As such, this case falls within the category of cases found by the Supreme Court to be properly removed under the federal officer removal statute.  *See Watson*, 551 U.S. at 153-54.

For the reasons stated above, the undersigned finds that CAEC has acted under the RUS for purposes of federal officer removal.

***Causal nexus***

To satisfy the causal nexus requirement CAEC must establish a causal connection between the acts it performed under color of federal office and the claims asserted by

---

[Alabama Electric Cooperative] and its member cooperatives is necessary to make the Rural Electrification program work." (footnote and citation omitted)).

[14]     *See* Central Alabama Electric Cooperative: Our Story, http://caec.coop/about-caec/our-story/ (last visited July 10, 2015).

[15]     Arguably, CAEC is more closely tied to the federal government than Blue Cross Blue Shield in *Jacks* and *Anesthesiology Associates*.  Although Blue Cross Blue Shield serves the federal government pursuant to its contractual agreements, it was not created to fulfill a federal program.  As the Northern District of Georgia commented, rural electric cooperatives owe their existence to the federal government.  *Greensboro Lumber*, 643 F. Supp. at 1358.

the Plaintiff.  *Magnin*, 91 F.3d at 1427; *Morgan*, 2011 WL 6056083, at *8.  "The hurdle erected by this requirement is quite low, as '[t]he statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority.'"  *Isaacson*, 517 F.3d at 137-38 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926)); *see id.* at 138 (stating that the causal connection requirement must be afforded a broad interpretation); *Morgan*, 2011 WL 6056083, at *8 ("[T]he causal nexus requirement does not establish a stringent standard." (citations and internal quotation marks omitted)); *Kritner v. Arab Elec. Coop.*, No. 4:15-CV-341-VEH, 2015 WL 2354414, at *4 (N.D. Ala. May 14, 2015) ("This requirement is 'quite low.'" (citation omitted)).

CAEC easily satisfies this requirement because the conduct at issue, the failure to distribute revenues to members of the cooperative, was performed under color of federal office.  As discussed above, the RUS controlled distributions, and CAEC claims that the specific distributions demanded by the Plaintiff were withheld pursuant to the RUS's requirement that it maintain equity in an amount greater than or equal to 30% of its total assets.   (*See* doc. 1, ¶¶ 7-8.)   The Plaintiff argues that CAEC has not demonstrated a causal nexus because CAEC has not fully shown why it cannot make the distributions demanded by the Plaintiff without violating contractual provisions and RUS regulations.  (Doc. 8 at 13.)  The Plaintiff argues that CAEC needed to disclose the value of its assets and explain how distributions of capital would cause its equity to fall below 30% of its total assets.  (*Id.*)

Again, CAEC's burden is not so onerous.  *See Acker*, 527 U.S. at 432 ("To choose between those readings of the Ordinance is to decide the merits of this case. Just as requiring a clearly sustainable defense rather than a colorable defense would defeat the purpose of the removal statute, . . . so would demanding an airtight case on the merits

in order to show the required causal connection. Accordingly, we credit the [defendants'] theory of the case for purposes of both elements of our jurisdictional inquiry and conclude that the [defendants] have made an adequate threshold showing that the suit is "for a[n] act under color of office." (citations and internal quotation marks omitted)); *Morgan*, 2011 WL 6056083, at *8 (noting the low causal nexus standard); *see also supra* note 6.   CAEC has satisfied the causal nexus requirement through its representations in the notice of removal and its contract with the United States.

### Colorable federal defense

Lastly, the undersigned considers whether CAEC has raised a colorable federal defense.  "In construing the colorable federal defense requirement, [the Supreme Court] ha[s] rejected a 'narrow, grudging interpretation' of the statute."  *Acker*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407).  "[The federal] defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin*, 91 F.3d at 1427; *see Acker*, 527 U.S. at 431 ("We therefore do not require the officer virtually to 'win his case before he can have it removed.'" (quoting *Willingham*, 395 U.S. at 407)); *id.* (concluding that the defendants asserted a colorable federal defense even though that defense was ultimately rejected).

> Although different courts have couched the quantum of proof necessary to establish a "colorable federal defense" differently, they have overwhelmingly framed it as a modest burden for removing defendants. *See, e.g., Hagen*, 739 F. Supp. 2d at 783 ("[T]he Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial."); *Corley* [*v. Long-Lewis, Inc.*], 688 F. Supp. 2d [1315,] 1332 [(N.D. Ala. 2010)] (to satisfy "colorable defense" requirement, "[a]ll a removing defendant needs to do is to make a showing that his federal defense is not without foundation and made in good faith.") (citation and internal quotation marks omitted); *McGee* [*v. Arkel Int'l, LLC*], 716 F. Supp. 2d [572,] 578 [(S.D. Tex. 2009)] (to satisfy this prong, the removing defendant

"need not prove the asserted defense, but need only articulate its 'colorable' applicability to the plaintiff's claims").

*Morgan*, 2011 WL 6056083, at *5.

CAEC fulfilled the colorable federal defense requirement by asserting the defense of conflict preemption.  (Doc. 11 at 13-14.)  "Conflict preemption . . . arises in instances where (1) 'compliance with both federal and state regulations is a physical impossibility,' or (2) 'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013) (quoting *Arizona v. United States*, --- U.S. ----, 132 S. Ct. 2492, 2501, 183 L. Ed. 2d 351 (2012)).  As discussed above, CAEC argues that Ala. Code § 37-6-20, the state law that governs Plaintiff's claims and requires distribution of excess revenue, conflicts with the Rural Electrification Act ("RE Act") and 7 C.F.R. § 1717.617, which prohibits CAEC from making distributions to its members unless its "equity will be greater than or equal to 30 percent of its total assets[,]" *id.*  CAEC also argues that the state law, as construed by the Plaintiff, "create[s] an obstacle to and frustrate[s] the purpose of the [RE] Act [and] [] § 1717.617."  (Doc. 11 at 14.)

The Plaintiff argues that CAEC cannot assert a federal preemption defense because the Fifth and Seventh Circuits have rejected preemption defenses asserted by rural electric cooperatives that argued that state rate-setting regulations were preempted by federal law.  (Doc. 8 at 16-17 (citing *In re Cajun Elec. Power Coop., Inc.*, 109 F.3d 248 (5th Cir. 1997); *Wabash Valley Power Ass'n, Inc. v. Rural Elec. Power Coop., Inc.*, 988 F.2d 1480 (7th Cir. 1993); doc. 12 at 10-11 (same)).)  The Plaintiff contends that those two cases "signal the federal judiciary's reluctance to find federal preemption of state law concerning electric cooperatives."  (Doc. 8 at 17.)  However, even if the Fifth and

Seventh Circuits have signaled their reluctance to find preemption in such cases, those circuits certainly have not foreclosed CAEC's attempt to assert a *plausible* preemption defense in this Court based on the facts in this case.[16]  As stated above, CAEC need not demonstrate the ultimate validity of its preemption defense at this juncture.  *See Magnin*, 91 F.3d at 1427; *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007) (concluding that the RUS satisfied the colorable federal defense requirement where it asserted that the plaintiff's claim was preempted by the RE Act).

Furthermore, in *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 103 S. Ct. 1905, 76 L. Ed. 2d 1 (1983), the Supreme Court confirmed that "[a state regulatory body] can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the REA."  *Arkansas Electric*, 461 U.S. at 389.  Additionally, while the Supreme Court ultimately held that Arkansas' state regulatory jurisdiction over wholesale utility rates was not preempted by the RE Act, the Court left open the possibility that certain state regulations could be implicitly preempted by the RE Act if they "seriously compromise[d] important federal interests."  *Id.* ("[E]ven without an explicit statement from the REA, a particular rate set by [a state regulatory body] may so seriously compromise important federal interests, including the ability of [a rural electric cooperative] to repay its loans, as to be implicitly preempted by the [RE] Act.").  Subsequently, the Fifth Circuit concluded that a state law condemnation

---

[16]     The undersigned notes that in *Cajun Electric* and *Wabash Valley* the courts did not address the federal officer removal statute and did not make any determination as to whether the preemption defenses asserted were *plausible*.  *See Cajun Electric*, 109 F.3d at 253-58; *Wabash Valley*, 988 F.2d at 1486-91.  The undersigned also notes that the Fifth Circuit determined in *Morgan City v. S. La. Elec. Coop. Ass'n* that a state law proceeding affecting a rural electric cooperative was preempted by federal law.  31 F.3d 319, 322-24 (5th Cir. 1994).

proceeding involving a rural electric cooperative was preempted by federal law in light of the federal purpose expressed through the RE Act.  *Morgan City*, 31 F.3d at 322-24 ("Were [the plaintiff's] expropriation action allowed to stand, it would stand as an obstacle to the repayment of federal loans, to the financial viability of federally financed electricity cooperatives, and ultimately, to the maintenance of electricity service to rural areas. . . . Because we find that the proposed state-law condemnation would frustrate the federal purpose of providing low-cost, reliable electric service to rural areas, the state-law condemnation proceeding is preempted under the Supremacy Clause." (citation and internal quotation marks omitted)).

The Plaintiff also argues that CAEC has not established its preemption defense because it has not shown that it is impossible to comply with both the federal and state laws at issue.  (Doc. 8 at 15-16.)  Again, CAEC need not prove its preemption defense at this time.  *See Einhorn v. CarePlus Health Plans, Inc.*, 43 F. Supp. 3d 1268, 1270 (S.D. Fla. 2014) ("[The defendant] contends that at all times it was acting pursuant to [federal] rules and regulations . . . [and] that it has several defenses based on federal law, including . . . federal preemption . . . . 'The extent to which federal law imposes certain requirements upon [the defendant] . . . and whether [federal law] may afford [it] any corresponding protection . . . from . . . liability, are issues of federal law.' . . . The court need not at this moment rule on the merits of [the] defenses. 'All a removing defendant needs to do is make a showing that his federal defense is not without foundation and made in good faith.'" (quoting *Magnin*, 91 F.3d at 1428; *Marley v. Elliot Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008))).

The undersigned finds that, for purposes of the federal officer removal statute, CAEC has adequately shown that its preemption defense is plausible.  *See City of Cookeville*, 484 F.3d at 391; *Einhorn*, 43 F. Supp. 3d at 1270.

## Conclusion

Keeping in mind the liberal construction afforded the federal officer removal statute, the undersigned has concluded that CAEC has shown that it is a person for purposes of the statute, that it acted under the RUS, that its actions under the RUS are causally connected to the Plaintiff's claims, and that it has a colorable federal defense. Accordingly, the undersigned finds that this case was properly removed to this Court pursuant to 28 U.S.C. § 1442(a)(1).  Therefore, it is hereby **RECOMMENDED** that the Plaintiff's Motion to Remand (doc. 8) be **DENIED**.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4. The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely

incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this the 10th day of July 2015.

                     s/WILLIAM E. CASSADY
                     **UNITED STATES MAGISTRATE JUDGE**