## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM A. DAVIS, on behalf of himself** | ) | |
| **and on behalf of others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 15-0131-WS-C** |
| | ) | |
| **CENTRAL ALABAMA ELECTRIC** | ) | |
| **COOPERATIVE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter comes before the Court on plaintiff William A. Davis's Motion to Remand (doc. 8), the Magistrate Judge's Report and Recommendation (doc. 21) recommending denial of said Motion, and plaintiff's Objection (doc. 24) to same.

### I.     Background.

On July 10, 2015, Magistrate Judge Cassady entered a Report and Recommendation in which he recommended that plaintiff's request to remand this action to the Circuit Court of Dallas County, Alabama, be denied.  The Report and Recommendation concluded that federal subject matter jurisdiction properly lies pursuant to the so-called federal officer removal statute, which authorizes removal of any civil action against "any officer (or any person acting under that officer) of the United States or of any agency thereof, … for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).

Davis timely filed an Objection, which has now been taken under submission.  By statute, the undersigned "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The applicable legal standard expressly authorizes the district court to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  *Id.*  This Order proceeds in recognition of those principles.

**II.     Analysis.**

To establish jurisdiction under § 1442(a)(1), a removing defendant must show that "(1) it is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office."  *Morgan v. Bill Vann Co.*, 2011 WL 6056083, *3 (S.D. Ala. Dec. 6, 2011).  The Report and Recommendation concluded that defendant, Central Alabama Electric Cooperative ("CAEC"), had satisfied each of these elements.  Plaintiff now offers objections that relate to the second, third and fourth factors.  Each will be considered in turn.

**A.     The 'Acting Under' Requirement.**

To satisfy the "acting under" requirement, a removing defendant must show something more than its status as a regulated firm or its obligation to comply with federal law.  *See, e.g., Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007) ("a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," and "[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official'").  Rather, this "acting under" element "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Id.* at 152.  Also, "[c]ritical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now being sued upon."  *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 488 F.3d 112, 124-25 (2nd Cir. 2007) (citation omitted).[1]  Courts also look to whether the defendant "provides a service the federal government would itself otherwise have to provide."  *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, --- F.3d ----, 2015 WL 3634888, *8 (3rd Cir. June 12, 2015); *see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("Cases

---

[1]     *See also Gordon v. Air & Liquid Systems Corp.*, 990 F. Supp.2d 311, 317 (E.D.N.Y. 2014) ("An entity acts under a federal officer when it helps with or carries out that officer's duty, often under close supervision."); *Morgan*, 2011 WL 6056083, at *3 n.3 ("[t]he 'acting under' element is satisfied if a defendant's actions that led to the lawsuit were based on a federal officer's direct orders or comprehensive and detailed regulations") (citation and internal quotation marks omitted).

in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government."). In evaluating a § 1442(a)(1) removal, courts must remain cognizant that, in contrast to other removal provisions, "[t]he words 'acting under' are broad, and this Court has made clear that the statute must be 'liberally construed.'" *Watson*, 551 U.S. at 147.

In his Objection, plaintiff maintains that the "acting under" requirement of § 1442(a)(1) is not satisfied here because the Rural Utilities Service ("RUS") simply "has a debtor/creditor relationship with CAEC." (Doc. 24, ¶ 6.).[2]  This characterization does not fairly capture the nature of the relationship and interaction between RUS and CAEC, as portrayed by defendant. As the Report and Recommendation explains, review of the history of RUS and its predecessor, the Rural Electrification Administration ("REA"), reveals that CAEC and other rural electric cooperatives exist to provide a necessary public function conceived and directed by the United States. (*See* doc. 21, at 14-16.)[3]  In this regard, CAEC and other rural electric cooperatives assist the federal government by carrying out the rural electrification program, providing electric power supply and distribution services that the RUS would otherwise have to undertake to provide itself. (*Id.*)[4]

---

[2]  "RUS makes loans and loan guarantees to finance the construction of electric distribution, transmission and generation facilities, including system improvements and replacements required to furnish and improve electric service in rural areas, and for demand side management, efficiency and energy conservation programs, and on grid and off grid renewable energy systems." 7 C.F.R. § 1710.100.

[3]  One appellate court summarized the federal government's conception and direction of this public function in the following terms: "In 1936 Congress, concerned with the fact that those then engaged in the business of generating electrical energy had failed to extend electric service to the farms of America, created the [REA]. … Congress determined that the national interest would be served by subsidizing the rural user of electricity. … True, the United States, when the loan is paid, no longer has the same direct interest in the borrowing distributor, but so long as the United States is interested in keeping the electric lamps lit on the farms, it is of necessity interested in the vehicles distributing the electricity which will light those lamps." *Public Utility Dist. No. 1 of Pend Oreille County v. United States*, 417 F.2d 200, 201 (9th Cir. 1969) (footnotes omitted).

[4]  The Court will not reiterate all of the authorities identified by the Magistrate Judge in support of this proposition.  Federal courts have long recognized, however, that the objective of the REA "was to provide electricity to those sparsely settled areas which the investor-owned utilities had not found it profitable to service" through the use of non-profit (Continued)

As an instrumentality of the United States furthering the federal government's objective of providing economical electric power to farms that investor-owned utilities had forsaken, CAEC is much more than merely a borrower from a federal agency.  Viewed in this light, CAEC works hand in hand with RUS to assist that agency in facilitating rural electrification, providing services that otherwise RUS would have to perform in order to fulfill that objective.  These specific considerations concerning the shared goals and interrelationship between CAEC and federal regulators demonstrate that, far from an ordinary, run-of-the-mill borrower/lender relationship, CAEC effectively assists and helps RUS in fulfilling its statutory objective.

In addition to helping RUS to carry out its public function, CAEC operates under close supervision, direction and control of RUS.  The Report and Recommendation correctly observed that RUS exercises considerable control over CAEC's operations, pursuant to both detailed governing regulations and extensive contract provisions.  (Doc. 21, at 6-9.)[5]  This level of control

_____

cooperatives owned by consumer members "who have been unable to obtain electricity from any other source."  *Salt River Project Agr. Imp. and Power Dist. v. Federal Power Commission*, 391 F.2d 470, 473 (D.C. Cir. 1968).  The REA was "an attempt, through rural electrification cooperatives, to bring economical electric power to the nine out of ten farms that were then without it."  *Id.* at 475.  In the words of the old Fifth Circuit, "rural electric cooperatives are something more than public utilities; ***they are instrumentalities of the United States***.  They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America."  *Alabama Power Co. v. Alabama Elec. Co-op., Inc.*, 394 F.2d 672, 677 (5th Cir. 1968) (emphasis added, and citation and internal quotation marks omitted); *see also Fuchs v. Rural Elec. Convenience Co-op. Inc.*, 858 F.2d 1210, 1217 (7th Cir. 1988) ("Unlike private actors who seek to further their own interests and will exploit market factors to reap the highest possible profits, rural electric cooperatives are in some sense instrumentalities of the United States.") (citations and internal quotation marks omitted).  In short, RUS and CAEC work hand in hand to make rural electrification a reality, one which would not exist if the matter were left to traditional investor-owned utilities.

[5]      Review of the pertinent regulations readily reveals the extensive direction and close supervision that CAEC receives from RUS in performing its operations.  *See, e.g.,* 7 C.F.R. § 1710.117 (requiring borrowers to comply with NEPA and "any other applicable Federal or state environmental laws and regulations"); 7 C.F.R. § 1710.120 ("Borrowers shall follow all RUS requirements regarding construction work plans, energy efficiency and conservation program work plans, construction standards, approved materials, construction and related contracts, inspection procedures, and bidding procedures."); 7 C.F.R. § 1710.121 ("Borrowers are required to comply with certain requirements with respect to insurance and fidelity coverage …."); 7 C.F.R. § 1710.122 ("Borrowers are required to comply with certain regulations on nondiscrimination in program services and benefits and on equal employment opportunity …."); (Continued)

is significant to the "acting under" analysis.  *See, e.g., Carter v. Monsanto Co.*, 635 F. Supp.2d 479, 488 (S.D. W.Va. 2009) ("a defendant acts under the control of a federal officer if the federal officer has 'direct and detailed control' over the activity"); *Swanstrom v. Teledyne Continental Motors, Inc.*, 531 F. Supp.2d 1325, 1331 (S.D. Ala. 2008) ("To determine whether a defendant is acting under the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendant.") (citations and internal quotation marks omitted).  The Report and Recommendation properly relied on the unusually close and detailed regulatory and contractual relationship between CAEC and RUS and determining that this case is distinguishable from the ordinary situation where a defendant in a highly regulated industry or in a contractual relationship with the government does not thereby satisfy the "acting under" requirement of § 1442(a)(1).[6]

---

7 C.F.R. § 1710.123 ("Borrowers are required to comply with certain requirements on debarment and suspension ….."); 7 C.F.R. § 1710.251 ("All distribution borrowers must maintain a current CWP approved by their board of directors covering all new construction, improvements, replacements, and retirements of distribution and transmission plant, and improvements replacements, and retirements of any generation plant."); 7 C.F.R. § 1710.301 (requiring distribution borrowers to prepare and maintain financial forecasts covering at least ten years); 7 C.F.R. § 1717.603(a) ("Prior written approval by RUS is required for a distribution borrower to extend or add to its electric system if the extension or addition will be financed by RUS."); 7 C.F.R. § 1717.605 ("All borrowers … are required to comply with applicable RUS requirements with respect to system design, construction standards, and the use of RUS accepted materials."); 7 C.F.R. § 1717.608 (enumerating circumstances in which RUS approval is necessary for borrower's contracts for construction, architecture, engineering, power supply, system management and maintenance); 7 C.F.R. § 1717.611(a) ("the selection of a certified public accountant by the borrower to prepare audited reports required by RUS remains subject to RUS approval").

[6]      Plaintiff objects to the Report and Recommendation's finding that RUS exercises considerable control over CAEC's operations via regulations and contract provisions. (Doc. 24, ¶ 5.)  As stated *supra*, however, that finding is well grounded in the applicable regulatory and contractual terms.  The stated basis of plaintiff's objection is that the "regulations do not operate to direct or control all of CAEC's operations, namely corporate governance."  (*Id.*, ¶ 6.)  But nothing in the § 1442(a)(1) legal standard requires a defendant to show that a federal agency directs or controls all of its operations in order to satisfy the "acting under" requirement. Plaintiff cites no authority to the contrary.  Moreover, plaintiff's reference to "corporate governance" is curious and unexplained.  If, by "corporate governance," Davis means CAEC's practice of not making cash patronage refunds, then he is incorrect.  The regulation found at 7 (Continued)

In light of the foregoing considerations, and with due regard for the liberal construction that § 1442(a)(1) must be afforded and the breadth of its "acting under" language, the Court makes a *de novo* determination that plaintiff's claims in this action are based upon CAEC's conduct "acting under" a federal officer. Plaintiff's objections to that aspect of the Report and Recommendation are **overruled**.

### B.      The "Causal Nexus" Requirement.

To satisfy § 1442(a)(1), CAEC must also show a causal nexus between the acts that form the basis of the lawsuit and the defendant's acts performed pursuant to either the federal officer's direct orders or comprehensive regulations. *See, e.g., Citrano v. John Crane-Houdaille, Inc.*, 1 F. Supp.3d 459, 469 (D. Md. 2014) ("To establish a causal connection, GE must show that the acts that form the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations.") (citations, internal marks and footnote omitted); *Cabalce v. VSE Corp.*, 922 F. Supp.2d 1113, 1122 (D. Haw. 2013) ("The 'causal nexus' between a federal officer's directions and the private actor must be predicated on a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations.") (citations and internal quotation marks omitted). "The causal nexus requirement does not establish a stringent standard …. The defendants in this case need only show that the federal direction created the circumstances underlying the liability." *Carter*, 635 F. Supp.2d at 489; *see also Morgan*, 2011 WL 6056083, at *8 (similar).

The Report and Recommendation correctly found that the low hurdle of the "causal nexus" requirement has been overcome. (Doc. 21, at 16-18.) The gravamen of the Complaint is that CAEC violated Alabama law and contractual provisions by repeatedly and consistently failing to refund excess revenue to its members in the form of patronage refunds. Meanwhile, CAEC's filings identify federal direction by which RUS purportedly forbade CAEC (in its role as an instrumentality of the United States performing rural electrification services hand-in-hand with RUS) from distributing the very patronage capital refunds that Davis demands in this

---

C.F.R. § 1717.617(a) is directly on point, and on its face operates to constrain CAEC's ability to make such distributions.

lawsuit.[7]  Defendant's position is that it "cannot make yearly cash refunds of all patronage capital because of this detailed regulation and the loan contract."  (Doc. 11, at 12; *see also* doc. 1, at ¶¶ 6-8.)  Such an allegation, if proven, readily establishes the requisite causal connection between the federal direction of CAEC (*i.e.*, RUS's purported restriction preventing CAEC from making the subject patronage refunds) and the acts forming the basis of this lawsuit (*i.e.*, CAEC's failure to make such refunds to Davis).  The Court concurs with the Report and Recommendation on this point, and **overrules** plaintiff's objection.[8]

### C.      The "Colorable Federal Defense" Requirement.

Finally, plaintiff challenges the portion of the Report and Recommendation determining that CAEC has raised a colorable federal defense for purposes of § 1442(a).  The Magistrate Judge concluded that CAEC had presented a colorable defense of conflict preemption, based on the apparent collision between Alabama Code § 37-6-20 (which provides that electrical cooperatives must distribute all excess revenues to members as patronage refunds or general rate reductions) and 7 C.F.R. § 1717.617(a) (which forbids borrowers such as CAEC from making

---

[7]      The pertinent regulation reads as follows: "If a distribution or power supply borrower is required by its loan documents to obtain prior approval from RUS before … paying or determining to pay any patronage refunds, … such approval is hereby given if … [a]fter giving effect to the distribution, the borrower's equity will be greater than or equal to 30 percent of its total assets."  7 C.F.R. § 1717.617(a).  And the contract between RUS and CAEC barred CAEC from making distributions to its members, without prior written approval of RUS, unless "after giving effect to any such Distribution, the Equity of [CAEC] shall be greater than or equal to 30% of its Total Assets."  (Doc. 1, Exh. B, at § 6.8.)

[8]      Plaintiff's "causal nexus" objection is that CAEC has failed to submit "evidentiary support" that the RUS regulations and loan provisions forbade it from distributing patronage refunds, or that it could not have obtained authorization from RUS to do so.  (Doc. 24, at 2-3.)  But the Report and Recommendation addressed this point in multiple places, identifying authorities in support of the proposition that CAEC does not bear the onerous burden of proving up the merits of the case in order to establish § 1442(a)(1) jurisdiction.  (*See* doc. 21, at 9 n.7 & 17-18.)  Plaintiff offers neither argument nor citations to authority to rebut the Magistrate Judge's determination that CAEC need not prove at this juncture that RUS compelled it to withhold cash patronage refunds, which act underlies Davis's Complaint.  Rather, it is enough that CAEC points to regulatory and contract provisions that appear on their face to constrain the demanded distributions, as well as representations by defendant in the Notice of Removal and briefs that, in declining to issue patronage capital distributions to its members, CAEC was acting under the direction of, and in compliance with its contract and loan obligations to, RUS.  Defendant need not prove these allegations in order to withstand plaintiff's Motion to Remand.

patronage refunds that result in the borrowers' equity dropping below 30% of total assets).  In the Objection, plaintiff asserts that this clash between federal and state provisions cannot give rise to a colorable preemption defense for CAEC in this action because the Rural Electrification Act does not preempt state regulation of electrical cooperatives.  (Doc. 24, ¶¶ 7-8.)

From the outset, it bears emphasis that CAEC need not <u>prove</u> its preemption defense in order for removal to be proper under § 1442(a)(1); rather, defendant's burden is merely to show that such a federal defense is not without foundation and is made in good faith.  "Because a core purpose of the statute is to let the validity of the federal defense be tried in federal court, a defendant seeking removal need not virtually win his case, nor must his defense even be clearly sustainable on the facts."  *Cuomo v. Crane Co.*, 771 F.3d 113, 115-16 (2nd Cir. 2014) (citations and internal marks omitted); *see also Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) ("the officer seeking removal need not win his case by proving his federal defense before he can have it removed") (citation and internal marks omitted); *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("That defense need only be plausible; its ultimate validity is not to be determined at the time of removal.").  "The inquiry on the motion to remand is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue.  A merely 'colorable' defense is sufficient …."  *Cuomo*, 771 F.3d at 116 (citation and internal quotation marks omitted).

The crux of plaintiff's objection to the Report and Recommendation's "colorable federal defense" finding is his citation to two cases purportedly establishing that the Rural Electrification Act does not preempt state regulation of electrical cooperatives.  The trouble with this argument is that the cited cases are neither as broad nor as on-point as plaintiff would have them be.  Indeed, those cases examine Rural Electrification Act preemption of the states' ratemaking authority.  *See In re Cajun Elec. Power Co-op., Inc.*, 109 F.3d 248, 255 (5th Cir. 1997) ("There are reasons to doubt that the Secretary is authorized to pre-empt **state ratemaking power or to fix borrowers' rates** for any purpose.") (emphasis added); *Wabash Valley Power v. Rural Electrification Admin.*, 988 F.2d 1480, 1489 (7th Cir. 1993) ("To argue that Congress did not intend for states to frustrate the goals of the RE Act falls short of establishing a statutory basis for the REA's sweeping assumption of regulatory authority over **ratemaking for cooperatives**.")

(emphasis added).[9]  But this is not a ratemaking case.  The Complaint does not allege that CAEC unfairly or improperly raised rates (at the behest of RUS or otherwise).  Moreover, plaintiff identifies no authorities and presents no arguments that the non-preemption findings of these ratemaking cases would or should apply equally to the issue of patronage refunds.  Perhaps the analysis is the same in both the patronage refund context and the ratemaking context.  Perhaps it is not.  Either way, the Court has no information before it at this time that would categorically negate the availability of any plausible preemption defense to CAEC on the question of patronage refunds, as a matter of law.

Additionally, the Supreme Court has expressly acknowledged, albeit in *dicta*, that a state agency "can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the REA."  *Arkansas Elec. Co-op. Corp. v. Arkansas Public Service Com'n*, 461 U.S. 375, 388, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983).  Is that not what we have here?  Alabama Code § 37-6-20 appears to be in conflict with many applications of § 1717.617(a).  Plaintiff's Objection does not refute this point, which was central to the Magistrate Judge's plausibility finding.  (Doc. 21, at 20-21.)  The Supreme Court also observed in *dicta* that, even in the rate-setting context, a state agency might set a rate that "may so seriously

_____

[9]      The third case which Davis cites in his Objection is an unpublished slip opinion from the District of South Carolina, styled *Mansfield v. Edisto Elec. Coop., Inc.*, C.A. No. 5:09-01645-MBS (D.S.C. Mar. 30, 2010).  As the Report and Recommendation correctly observes, the issue in *Mansfield* was whether preemption issues gave rise to federal question jurisdiction under 28 U.S.C. § 1331, not federal officer removal jurisdiction under 28 U.S.C. § 1442(a)(1).  As such, *Mansfield*'s preemption discussion is unilluminating for the § 1442(a)(1) issues presented here.  If anything, *Mansfield* undercuts Davis's position by acknowledging that § 1717.617 serves "to declare only the primacy of federal law" on the topics covered therein and that "'ordinary' preemption [is] contemplated by §§ 1717.300 and 1717.617" (doc. 24, Exh. A, at 11).  Thus, the *Mansfield* court opined that § 1717.617 actually did establish primacy of federal law and did contemplate ordinary preemption (*i.e.*, a federal defense to state-law claims), which is precisely CAEC's point.  The removing defendant's error in *Mansfield* was its attempt to use § 1717.617 to establish federal question jurisdiction (which requires complete – not ordinary – preemption) for a complaint seeking to strike down the defendant's bylaws (the "corporate governance" issue to which the opinion alludes).  By contrast, CAEC would use § 1717.617 as a basis for federal officer removal jurisdiction for Davis's complaint seeking disgorgement of patronage distributions that § 1717.617 (along with other regulations and contract provisions) may forbid.  The Court thus agrees with the Magistrate Judge that plaintiff's reliance on *Mansfield* is misplaced, and that *Mansfield* (even if it were deemed persuasive) would neither mandate nor even support a contrary result from that in the Report and Recommendation.

compromise important federal interests, including the ability of the [cooperative] to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act." *Arkansas Elec.*, 461 U.S. at 388.  It is at least plausible that the forced patronage refunds mandated by the Alabama statute might so seriously compromise important federal interests as to be implicitly preempted by the Rural Electrification Act.  Once again, plaintiff's Objection offers no rejoinder to this premise, on which the Report and Recommendation relied.

Plaintiff's objection is that, as a matter of settled federal law, the Rural Electrification Act does not expressly or implicitly preempt state regulation of electrical cooperatives.  (Doc. 24, ¶¶ 7-8.)  Such a broad, sweeping statement is not supported by the text of the cases on which plaintiff relies, nor does he adequately address or respond to certain authorities and propositions lying at the bedrock of the Report and Recommendation on this point.  Whatever merit CAEC's preemption defense may or may not ultimately have, the Court finds that the modest hurdle created by the "colorable federal defense" requirement of § 1442(a)(1) has been satisfied here.[10]

## III.   Conclusion.

For all of the foregoing reasons, as well as those set forth in the Report and Recommendation, plaintiff's Objection to Magistrate Judge's Recommendation (doc. 24) is **overruled**.  The Report and Recommendation (doc. 21) issued on July 10, 2015 pursuant to 28 U.S.C. § 636(b)(1)(B) is **adopted** as the opinion of this Court.  Plaintiff's Motion to Remand (doc. 8) is **denied**.

DONE and ORDERED this 11th day of August, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

[10]  In his Objection, Davis also suggests that the following facts and circumstances favor rejection of the Report and Recommendation: (i) "CAEC has not sought to add the RUS as a third-party, and the RUS has not sought to intervene in this matter;" and (ii) "Baldwin County Electric Membership Cooperative is currently litigating identical claims with its members in Alabama state court" and "never sought to remove the case."  (Doc. 24, ¶¶ 8-9.)  Neither item is relevant to the § 1442(a)(1) jurisdictional analysis here.  The preemption defense asserted by CAEC does not hinge on RUS's presence in the lawsuit as either a third-party defendant or a defendant in intervention.  And the fact that some other electric cooperative facing a similar state-court lawsuit elected not to invoke § 1442(a)(1) removal rights says nothing about the propriety of CAEC's exercise of those rights here.